IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| BDC/BEND SPE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 210180R |
| | ) | |
| v. | ) | |
| | ) | |
| DESCHUTES COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appealed Defendant's Board of Property Tax Appeals (BOPTA) Personal

Property Order and BOPTA's Real Property Order, both dated March 9, 2021, for the 2020-21

tax year. BOPTA sustained Defendant's roll value on Account 279959 (personal property) at

$2,274,179 and reduced Defendant's roll value on Account 273512 (land and improvements) to

$48,725,820. (Compl at 3-4.) A trial was held remotely via Webex on October 12 and October

13, 2021. Chris Robinson, CKR Law Group, P.C., appeared on behalf of Plaintiff. Aaron

Brown, appraiser and member of the Appraisal Institute (MAI), testified on behalf of Plaintiff.

Dan Lamey, President of BPM Real Estate Group, testified on behalf of Plaintiff. Amy Heverly,

Assistant County Counsel, appeared on behalf of Defendant. Sarah Malikowski,

Commercial/Industrial Appraiser for Deschutes County, testified on behalf of Defendant.

Plaintiff's Exhibit 1 was received into evidence without objection. Defendant's Exhibits A, A1,

B, and C were admitted into evidence without objection. Exhibit A2 was admitted only as

evidence of Defendant's general approach.

I. STATEMENT OF FACTS

The subject property is a four-story, 195,178-square-foot, 136-unit, independent senior

living facility situated on approximately 3.75 acres in a prime location near activities and a

medical center in Bend, Oregon. The subject property was completed in 2019 and opened for business in September 2019. Plaintiff stipulated to Defendant's value for the personal property, Account 279959, at $2,274,179, and the land value portion of Account 273512 at $2,940,300, for purposes of trial only.

The parties agree that the subject property's large amount of common space, almost 40 percent, is higher than typical for this type of property. Brown describes the subject property as serving a niche market for "middle[-] to upper[-]income seniors." (Ptf's Ex 1 at 55.) Amenities include a bistro/café, grab and go store, fireside lounge, pool and spa room, barber shop, beauty salon, exercise room, men's and women's locker/shower rooms, massage parlor, sauna, commercial laundry and kitchen, dining room, bar/lounge, game room, yoga center, craft room, activity room, and rooftop deck. Of the 136 units, 25 are studios averaging 526 square feet, 68 are one-bedrooms averaging 810 square feet, and 43 are two-bedrooms averaging 1,140 square feet.[1] The parties agreed that the highest and best use of the subject property is as a senior independent living facility.

A.      *Plaintiff's approach to value*

Brown testified he is an MAI and American Society of Appraisers certified appraiser with over 20 years of experience specializing in senior living, hotels, and motels. He prepared a retrospective fee simple appraisal of the subject property, as of January 1, 2020. He used three approaches to first determine the stabilized value of the property—the cost, sales comparison, and income approaches—before making further adjustments, including one to reflect the property's un-stabilized operation status as of the assessment date, as discussed below.

/ / /

---

[1] Each of the referenced square footage amounts is rounded.

1.    *Plaintiff's cost approach*

Brown began his cost approach by analyzing five comparable land sales and concluded the land value was $2,775,000.[2]  Next, Brown used Marshall & Swift software to estimate the replacement cost of the subject property.  Brown observed that Plaintiff's actual construction costs of just under $53 million were high because of "delays and errors" and determined the costs without those problems should have been approximately $45 million.  (Ptf's Ex 1 at 105.) Using the Marshall & Swift program actually yielded an estimated replacement cost of $33,613,068.  Brown added the land value, developer's profits, and costs for stabilization, and arrived at a rounded value of $51.5 million.  Ultimately, Brown did not place any weight on the cost approach because it is not an approach that he believed market participants would use to value the property.

2.    *Plaintiff's sales comparison approach*

In his sales comparison approach, Brown selected seven comparable sales and found a price range of $23,724,444 to $103,985,777, without adjustment.  He considered a price per square foot calculation, a price per unit calculation, and a third method, and ultimately determined the indicated value using the sales comparison approach was $48,100,000.  Brown did not rely heavily on the sales comparison approach because of the scarcity of individual sales and because many of the comparable sales were portfolio sales rendering the values attributed to each individual property as unreliable.

/ / /

/ / /

---

[2] Brown's land value analysis was rendered irrelevant by Plaintiff's stipulation of the land value at the start of trial.

3.    *Plaintiff's income approach*

In his income approach, Brown selected five comparable rental properties. He estimated a stabilized projected income of a rounded $6,725,000. He estimated projected expenses in the range of $3,745,000 to $3,805,000 and found a reasonable average was $3,765,000. Subtracting the expenses from income resulted in a capitalized net income of $2,825,000. Next, Brown considered capitalization rates from seven regional sales of senior care facilities averaging 6.54 percent; however, considering several influences, he found an actual capitalization rate of 5.73 percent. Using this figure, he computed the stabilized value using two methods—one with and one without property taxes—and arrived at a value of $48,950,000.

4.    *Plaintiff's adjustments to the stabilized real market value of the subject property*

In addition, Brown identified several significant issues to consider when evaluating the subject property: first, Brown testified that the value attributable to personal property should be deducted from the stabilized real market value; second, Brown testified that the subject property is newly built and had recently opened for business as of the assessment date and thus, its value must be adjusted for stabilized operations; and third, Brown highlighted the importance of subtracting the business enterprise (intangible) value from the subject property's stabilized value to determine its actual real market value.

a.    Adjustment for personal property

Brown testified that the sales of certain businesses, such as senior housing and nursing home facilities, include value for personal property, which must be excluded from a valuation for Oregon property tax purposes. Brown further testified that amenities for independent senior living facilities are far beyond those typically found in apartment buildings (*e.g.*, furniture, full dining rooms, commercial kitchen, library, bar/lounge, barbershop, etc.) and are generally sold

along with the real property. Therefore, Brown subtracted the personal property items from his determined stabilized value because those items are taxed differently and under a separate tax account.

### b. Adjustment for stabilization

Brown testified that because the subject property was new and had only recently begun operations as of the assessment date, any business activity would not be stabilized at that time. Based on his review, stabilized operations would consist of 95 percent occupancy and would be realized 15 months after the date of assessment. In his review, Brown considered the expenses, inflationary trend, and applied a discount rate resulting in an "as-is" market value of $46,750,000.

### c. Adjustment for intangible value

Brown also testified that the sales of certain businesses, such as senior housing and nursing home facilities, include value for intangibles, such as a going concern value, which must be excluded from a valuation for Oregon property tax purposes. Senior housing includes services such as "meal service, housekeeping, and activities." (Ptf's Ex 1 at 194.) Brown estimated that the subject property would require 37 employees to function at the level needed to achieve stabilized value. Brown acknowledged there are "multiple schools of thought" to account for this going concern value. (*Id*. at 195.) Brown chose a method of allocating the value of the personal property "and stabilized operation costs in the Cost Approach." (*Id*.) He deducted the personal property, allocated at $1,920,000 and the stabilized operation cost (projected in the cost approach) at $3,305,000, and arrived at a real market value of $43,725,000.

/ / /

/ / /

B.    *Defendant's approach to value*

Malikowski testified she has been a Commercial/Industrial Appraiser with Defendant for 18 years.  She prepared a retrospective appraisal of the subject property as of the assessment date, which considered all three approaches to value, but primarily relied on the sales comparison and income approaches.  Her cost approach used the ProLogic Valuation program and found a real market value of $48,874,180, including $2,274,180 of personal property.

For the sales comparison approach, Malikowski was unable to find individual local sales of comparable properties.  Her initial results returned only a single sale of the Mt. Bachelor Memory Care, and thus she widened her search, eliminated portfolio sales, and considered properties to bracket the subject property because there were still too few near comparable properties.[3]  Malikowski found sales in the range of $266 to $453 per square foot, and chose $273 per square foot, which resulted in a rounded value of $53,675,000, including personal property.  She used cost per square foot rather than cost per unit because she felt the subject property had a higher than usual percentage of common space, which improperly skewed the value downward.

For the income approach, Malikowski considered but rejected Plaintiff's "pro-forma" estimate of income and expenses and opted for those she considered to be typical in the industry.  She considered capitalization rates from thirty multi-family properties, including apartments, because sales of independent living facilities are rare.  She found an average capitalization rate of 5.45 percent, but "loaded" it with the county property change ratio and decided on an overall

_____

[3] *See* Appraisal Institute, *The Dictionary of Real Estate Appraisal* 22 (5th ed 2010) (defining "bracketing" as "[a] process in which an appraiser determines a probable range of values for a property by applying comparative analysis techniques to data such as a group of sales.  The array of comparable sales may be divided into three groups–those superior to the subject, those similar to the subject, and those inferior to the subject.  The sale prices reflected by the sales requiring downward adjustment and those requiring upward adjustment refine the probable range of values for the subject and identify a value range (i.e., a bracket) in which the final value opinion will fall.").

capitalization rate of 6.4 percent. (Def's Ex A at 29-30.) Malikowski found the value using the income approach was $53,274,180 including the furniture, fixtures, and equipment (FF&E). Although she acknowledged the subject property was newly opened without stabilized occupancy, she did not make an adjustment pursuant to Defendant's policy. Additionally, she did not make an adjustment because the tax year under appeal is an "exception event" where the maximum assessed value would be set and such an adjustment would create inequalities between other businesses, such as apartment buildings, and those like the subject property.

Malikowski ultimately found the real market value of the property was a rounded $51 million, to which she added the personal property FF&E at $2,274,180.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2020-21 tax year.

A.      *Real market value of the subject property, as stabilized*

 "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas Cty. Assessor*, TC-MD 020869D, WL 21263620 at *2 (Or Tax M Div Mar 26, 2003) (citation omitted). Real market value is defined in ORS 308.205(1),[4] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2020-21 tax year is January 1, 2020. ORS 308.007; ORS 308.210. The real market value of property "shall be determined by methods and procedures in

---

[4] The court's references to the Oregon Revised Statutes are to 2019.

accordance with rules adopted by the Department of Revenue * * *[.]"  ORS 308.205(2).  The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach.  OAR 150-308-0240(2)(a).  Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id*.

Here, both parties presented evidence on all three approaches per ORS 305.427.[5]  The parties agreed that the cost approach is not a good indicator of value for this property because it only estimates replacement cost of the improvements, whereas a typical purchaser of a senior independent living facility would most likely focus on the potential net income.  The parties also agreed that the sales comparison approach was of secondary usefulness for the subject property because there were too few local sales of similar properties and many of the comparable sales were portfolios involving multiple properties for which it would be difficult to ascertain the precise value of an individual property.  Additionally, seemingly comparable properties often involve different levels of care, such as assisted living, nursing care, or memory care.  These properties would have income from services that might be hard to compare to the subject property, which does not have care assistance services.

The parties applied a similar methodology for determining the value of the subject property using the income approach; they started with a hypothetical gross income, subtracted hypothetical costs, and then divided the result by a capitalization rate.  The parties' conclusions of stabilized values using this approach were fairly consistent; Plaintiff's value was $48,950,000

---

[5] ORS 305.427 provides: "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof.  The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."

and Defendant's value was a rounded $51 million. One difference between the parties' calculations was estimation of the capitalization rate; Plaintiff relied on sales of senior living facilities in an expanded geographical area to arrive at its capitalization rate, while Defendant relied on sales of apartments and senior living facilities focused on the local area only. The court finds that, in this case, the selection of properties of a similar nature to the subject property (*i.e.*, senior living facilities) is a better fit than it would be to look to other types of businesses, such as apartment buildings. Thus, the court finds Plaintiff's stabilized value as of the assessment date is more persuasive at $48,950,000.

B.     *Adjustments to the stabilized real market value*

Plaintiff presented three issues for consideration to adjust the real market value after reaching a conclusion on the subject property's stabilized value: (1) whether personal property should be deducted from the real property value because while independent living facilities are most often sold including the personal property, they are taxed separately; (2) whether the subject property's value as of the assessment date should be reduced because the newly built and operating property was not stabilized; and (3) whether there is a business enterprise value (also referred to as "intangible value" or "goodwill") that should be deducted.

1.     *Adjustment for personal property*

In their respective appraisals, both parties initially accounted for the personal property value with the appraised real property value. Plaintiff separated the personal property from its income approach value. Neither party presented evidence that would change the nature of the property from its roll value as personal property versus real property, thus, the character of the property remains the same. *See, e.g., Farmer's Direct, Inc. v. Dept. of Rev.*, 24 OTR 399, 434 (2021) ("the classification of property as tangible personal property or real property is intensely

factual, and the court must make the determination with a full understanding of the physical relationship between the items at issue and any real property * * *"). The court agrees that in any sale, the personal property would be sold together with the improvements and a prospective buyer and seller would allocate an amount for the personal property. Because Defendant maintains separate tax roll accounts and values for the personal property and real property, which was sustained by BOTPA, the court agrees the value of Account 279959 (personal property) at $2,274,179 should be deducted from the stabilized value.

2.     *Adjustment for stabilization*

The parties do not dispute that the subject property was not stabilized as of the assessment date. Plaintiff contends that the real market value of the subject property should be reduced because it is newly placed into service and as such, it is not stabilized, citing *Powell Street I, LLC v. Multnomah County Assessor*, 365 Or 245, 445 P3d 297 (2019). In *Powell Street I*, the Supreme Court held that a property which is not stabilized may affect "what a hypothetical buyer would pay a hypothetical seller for the property on the assessment date." *Powell Street I, LLC*, 365 Or at 260. Defendant asserts the issue is more complicated because this case involves an "exception year"—meaning this is the year the property's maximum assessed value will be set. Defendant argues that its policy requires ignoring the proposed adjustment because the stabilization period is short, and the adjustment would effectively lower the taxable assessed value for years to come. [6]

---

[6] Article XI, section 11 of the Oregon Constitution, also known as Measure 50, was adopted by the voters in 1997. *AKS LLC v. Dept. of Rev.*, TC 5308 and 5309, 2019 WL 1768087 at *8 (Or Tax Apr 18, 2019). Before Measure 50 was adopted, property taxes were based on the property's real market value. *Id.* Measure 50 created the concept of maximum assessed value and taxed property on the lesser of real market value or maximum assessed value. *Id.*; *see also* Or. Const., Art. XI, § 11(1)(f). Maximum assessed value cannot increase more than three percent per year. Or. Const., Art. XI, § 11(1)(b). However, that three percent rule is subject to several exceptions, including for "new property or new improvements to property." Or. Const. Art. XI, § 11(1)(c)(A); *see also* ORS 308.146(3)(a).

The court agrees with Plaintiff that that a prudent purchaser would pay less for a property that required an infusion of skill, cash, and time to bring it to a stabilized state. While Defendant's position is understandable, it is contrary to the holding in *Powell Street I*. The court finds that Plaintiff's adjustments for the costs to stabilize the subject property are persuasive. The combined value of the subject property should be reduced by $2.2 million.

3.      *Adjustment for intangible value*

Plaintiff argues that there is an intangible or going concern value that must be separated out and deducted from the stabilized value of the subject property. In its appraisal, Plaintiff cites to the fifth edition of the Appraisal Institute's Dictionary of Real Estate Appraisal, defining "goodwill" as "[a]n intangible asset category usually composed of elements such as name or franchise reputation, customer patronage, location, products, and similar factors." (Ptf's Ex 1 at 26.)

In *Boise Cascade Corp. v. Department of Revenue*, 12 OTR 263 (1991), Judge Byers considered the issue of goodwill and stated:

> "goodwill is not taxable property. If goodwill exists in connection with tangible, real or personal property, it arises not from the property but from the business operation of the property. Even where goodwill is associated with property such as hotels, the concept inherently is associated with the business operation. Consequently, goodwill is an intangible asset that is not subject to taxation."

*Id*. at 267 (citation omitted). More recently, this court used a similar description in *Huang v. Department of Revenue*, 20 OTR 1 (2009):

> "Goodwill is generally excluded from property taxation because goodwill is neither a part of real property nor tangible personal property, but instead arises from the business operations that are associated with those properties. Goodwill is the value of a business above the value of its physical assets. That value is attributable to such factors as expected profits, business location, reputation for good service, and other qualities that make the business attractive to individuals seeking its services. Because only real property and tangible personal property are assessed and taxed, and because goodwill is separate from those properties,

the value of goodwill is not included in [real market value]."

*Id.* at 6 (citations and footnote omitted).

In his appraisal report, Brown acknowledges the difficulty of valuing "intangibles." His approach allocated the "conclusions of personal property and stabilized operation costs in the [c]ost [a]pproach." (Ptf's Ex 1 at 195.) Brown projected the cost to stabilize the property from the assessment date to 95 percent occupancy at $3,305,000—of which a portion must be deducted as intangible value. The court is not altogether clear what evidence Brown is using to support a value of goodwill. If he is arguing that the subject property is an entity assembled with real property, personal property, and a trained professional staff that would likely be sold as a whole ongoing business, the court finds no evidence was presented to show that a brand-new facility has developed a "goodwill" value. If Brown is arguing that the sale price of other senior care facilities in the sales comparison approach necessarily included the goodwill of those businesses, then the court finds that Plaintiff offered insufficient evidence in support of that conclusion. The court is not persuaded that a newly built independent senior living facility that was not part of a franchise and was not stabilized, had any goodwill value at all as of the assessment date. Further, the costs to bring the subject property from its un-stabilized state as of the assessment date to a stabilized one have already been deducted from the property value. Plaintiff's approach twice removing the same value is duplicative and unpersuasive. In *Huang*, the court observed that a taxpayer must prove the value of goodwill, which may be difficult to separate from the real property value. *Huang*, 20 OTR at 6. Here, Plaintiff has not met its burden of proof under ORS 305.427 to deduct for intangible value.

/ / /

/ / /

III. CONCLUSION

The court finds Plaintiff's evidence more persuasive regarding the real market value of the subject property as stabilized at $48,950,000. The court finds that the value of the personal property as found by BOPTA and as stipulated by Plaintiff, in the amount of $2,274,179 should be deducted from the real property account. Because the property was not stabilized as of the assessment date, the court finds that $2.2 million should be deducted to account for stabilized value. Finally, the court is not persuaded by Plaintiff's argument that the subject property had intangible value requiring an additional deduction from the stabilized value. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value for the 2020-21 tax year is $44,475,821 for Account 273512 and $2,274,179 for Account 279959.

Dated this _____ day of January 2023.

RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on January 11, 2023.*