IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| LOWE'S HIW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 210115R |
| | ) | |
| v. | ) | |
| | ) | |
| MARION COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appealed a Real Property Order from the Marion County Board of Property Tax Appeals (BOPTA), mailed March 24, 2021, that sustained Plaintiff's real market value for tax account R337298 at $13,426,510 for the 2020-21 tax year. Plaintiff seeks a lower real market value than determined by BOPTA. A remote video trial was held on April 17 and 18, 2023. Benjamin Blair, an attorney with Faegre Drinker Biddle & Reath LLP, appeared on behalf of Plaintiff. Jeff Buono (Buono), Senior Valuation Services Director, Colliers International Valuation & Advisory Services, testified on behalf of Plaintiff. Scott Norris, Assistant County Counsel, appeared on behalf of Defendant. Craig Farnstrom (Farnstrom) county appraiser, testified on behalf of Defendant. Plaintiff's Exhibits 1 and 2 and Defendant's Exhibits A, C and D were received into evidence without objection.

## I. STATEMENT OF FACTS

The subject property is a 13.32-acre site with a 135,607-square-foot improvement built in 2002, specifically for and operating under a long-term lease as a Lowe's Home Improvement Warehouse. The subject property is located in Salem just off the intersection of Interstate 5 and Highway 22. The building structure is a typical "big box" home improvement warehouse in good condition with no observable physical obsolescence. The structure has a concrete masonry

exterior with few interior walls and an outside covered garden area.  The site includes 558 parking spaces.

A.      *Plaintiff's Evidence*

Buono testified that he is an MAI certified general real estate appraiser with approximately 20 years of experience and a Senior Valuation Services Director with Colliers International.[1]  Buono prepared a retrospective, fee-simple appraisal of the subject property's value as of January 1, 2020.  The subject property is located within the Salem Metropolitan Service Area (MSA), which is located about halfway between the Portland MSA (approximately 50 miles north) and Eugene MSA (approximately 50 miles south), encompasses both Marion and Polk counties, and comprises approximately 10 percent of the state's population.  Buono found that job growth in the Salem MSA was slower than the Portland MSA in recent years, however, Salem MSA job growth was still increasing at the fastest rate in 25 years.  He found no physical problems with the subject property, and Plaintiff had no plans to vacate the location.

Buono began by analyzing the subject property's highest and best use.  Although the subject property is currently under a long-term lease, Buono divided his highest and best use analysis into two parts: (1) an "As-Vacant Analysis," where the highest and best use is retail or commercial development; and (2) an "As-Improved Analysis," where the highest and best use is its existing use as a "retail property."  Buono rejected alternative treatments of the property such as "demolition, expansion, renovation, [or] conversion."  Buono considered three approaches to value: the cost, sales comparison, and income approaches.  He rejected the cost approach based on the age of the property and a "lack of [market-based] data to support an estimate of accrued depreciation."

---

[1] Member of the Appraisal Institute (MAI).

1. *Plaintiff's income approach*

Buono utilized the direct capitalization method in which comparable leases are considered, analyzing the income potential, subtracting hypothetical expenses such as for vacancy and operating expenses, and capitalizing the resulting net operating income at a market supported rate to arrive at a value. The analysis applied an annual three percent upward adjustment to account for the conditions between the oldest comparable sale through the assessment date.

Buono selected six lease comparables. During his selection, he could not find many big box stores. None of the comparables selected were "build-to-suit" like the subject property. Although many big box stores involve sale-leasebacks, none of the comparables selected involved that type of transaction. Buono did not select properties with national credit tenants because, in his view, those properties skew the market.

Comparable 1 is a September 2018 lease of a 96,296-square-foot Asian market, known as Shun Fat Market, located in southeast Portland, for $9.72 per square foot. Buono testified that the building had been converted from a closed Fred Meyer to accommodate subtenants, but the landlord did not pay for tenant improvements. Comparable 2 is a January 2020 lease of a 47,451-square-foot store, known as Parkrose Hardware, in West Linn, for $8.25 per square foot. Comparable 3 is an October 2019 lease of a 106,238-square-foot home decor store, known as At Home, in Kennewick, Washington, for $7.00 per square foot. Comparable 4 is an April 2019 lease of an 86,502-square-foot At Home store, in Spokane, Washington, for $9.48 per square foot. Comparable 5 is a December 2018 lease of an 85,160-square-foot At Home store, in Puyallup, Washington, for $10.36 per square foot. Comparable 6 is a November 2019 lease of a

/ / /

34,389-square-foot store, known as Wilco, in Lake Oswego, for $9.50 per square foot. Buono testified that five of the six comparables had been purchased by investors and demised.

Buono quantitatively adjusted upward for market conditions, resulting in adjusted rent values of $10.11 for Comparable 1, $8.25 for Comparable 2, $7.07 for Comparable 3, $9.67 for Comparable 4, $10.67 for Comparable 5, and $9.50 for Comparable 6. Buono qualitatively adjusted for property attributes, finding Comparables 1 and 5 to be high indicators of value, Comparables 2, 3 and 6 to be low indicators of value, and Comparable 4 a good indicator of value, as to the subject property. Buono's size adjustments were predicated on the subject property hypothetically being 67,804 square feet (half of the subject's actual size) because, in his view, smaller comparables would have higher rents per square foot (*i.e.*, economies of scale). Buono testified the adjustment for size was based on a cost to demise the property. Buono concluded from the lease comparables a lease rate of $9.75 per square foot, equating to a gross rent forecast of $1,322,168 per year.

Plaintiff's expense analysis assumed a triple-net lease, where the tenant pays for virtually all property and tax expenses. Buono further applied a "market 5% slippage" to expense reimbursements. Buono estimated expenses in the form of real estate taxes, property insurance, common area maintenance, management fees, and reserves totaling $502,484.

Buono used three techniques to develop a capitalization rate: comparable sales, investor surveys, and a "band of investment" technique. Buono selected 15 comparables to determine the appropriate capitalization rate, found a low of 6 percent, a high of 8.05 percent, and concluded with a rate of 7.25 percent for this technique. Buono's investor surveys provided capitalization rates of 4.5 to 10 percent, with an average of 6.22 percent. Buono's band of investment calculation indicated a capitalization rate of 6.17 percent. Buono testified he did not use the

lower capitalization rate typically available for national credit tenants because, in his view, it would unfairly skew the rate. Ultimately, Buono found the comparable sales approach the best indicator and concluded a capitalization rate of 7.25 percent.

Buono divided the net income, $1,188,710, by the capitalization rate of 7.25 and found an initial indicated rounded value of $16,400,00 before making a significant adjustment. Buono testified that he spoke with two brokers in the area who estimated the "lease-up costs" to be $50 per square foot, and thus subtracted $6,780,000, arriving at a value of $9,620,000 for the subject property using the income approach.

2. *Plaintiff's sales comparison approach*

Buono selected six comparable sales and applied an annual upward market adjustment of three percent for the difference between the sale date and the assessment date. He eliminated leased fee sales from consideration because the values of those transactions could skew the analysis.

Comparable 1 is a December 2019 sale of an 89,647-square-foot former Big K in Corvallis, for $74 per square foot. Comparable 2 is an April 2018 sale of a 136,756-square-foot former Costco in Medford, for $47 per square foot. Comparable 3 is a May 2018 sale of a 116,000-square-foot former Lowe's in Puyallup, Washington, for $88 per square foot. Comparable 4 is a September 2019 sale of a vacant Sears store in Vancouver, Washington, for $68 per square foot, containing 131,880 square feet of gross building area and 120,053 square feet of net rentable area. Comparable 5 is the November 2018 sale of an 86,479-square-foot former Big K in Oregon City, for $94 per square foot. Comparable 6 is the December 2018 sale of a 133,958-square-foot former Costco in Spokane, Washington, for $50 per square foot.

/ / /

Buono testified that Comparables 2 to 6 were purchased by investors with the plan to demise them into multiple leases. Buono made very slight adjustments and concluded a value at $70 per square foot, equating to a value of $9,490,000. Reconciling the income approach and sales comparison approach, Buono found the sales comparison approach value to be the best indicator of value for the subject property.

B.     *Defendant's Evidence*

Farnstrom testified he is a certified Oregon appraiser with 31 years of experience in the industry and has been a senior commercial property appraiser with Defendant for eight years. He prepared a retrospective fee-simple appraisal of the subject property as of the assessment date. (Ex A.) Farnstrom determined there was a stable market demand for large single-tenant retail properties in the Salem MSA, although he did find a slight decrease in the capitalization rate from 7.04 percent to 7 percent. Farnstrom determined the highest and best use for the subject property was its current single-tenant retail use. Farnstrom considered all three approaches to value.

1.     *Defendant's cost approach*

Farnstrom considered sales of four comparable properties to arrive at a land-only valuation for the subject property of $4,931,900. He then used the Marshall and Swift valuation service and determined the cost for the property improvements minus depreciation for age was $9,874,170, resulting in a total value of $14,806,030.

2.     *Defendant's income approach*

Farnstrom considered six comparable property leases for the income approach to value. Comparable 1 is the lease of a Home Depot located in Salem for $6.62 per square foot. Comparable 2 is the lease of a Costal Farm & Ranch in Salem for $8.00 per square foot.

Comparable 3 is a lease of a Hobby Lobby store in Salem at $8.40 per square foot. Comparable 4 is the lease of a Shun Fat Market in Portland for $9.72 per square foot. Comparable 5 is the lease of McLendon Hardware in Renton, Washington, for $8.97 per square foot. Comparable 6 is the lease of a Lowe's in Vernon, Washington for $8.49 per square foot.

Farnstrom found the overall average comparable lease rate at $8.37 per square foot, and the adjusted average of the three Salem comparable lease rates at $7.88 per square foot. Farnstrom settled on an $8.00 per square foot rental rate, calculating a base rental income of $1,105,064. He then added expected gross income from tenant reimbursements under a triple net lease to arrive at the projected gross income of $1,457,954. Farnstrom deducted 5 percent for vacancy and 30 percent for expenses, leaving a net operating income (NOI) of $969,539. He divided the NOI by a capitalization rate of 6 percent, concluding with a value of $16,159,000.

3.      *Defendant's sales comparison approach*

Farnstrom selected sales of four comparable properties. He found that sales of very similar properties in the immediate area of the subject property were uncommon, and thus he widened his area to both Oregon and Washington to capture properties that matched his highest and best use determination. Comparable 1 is a June 2020 sale of a Home Depot in Salem, for $12,200,000 or $114 per square foot. Comparable 2 is an April 2018 sale of a Lowe's in Mt. Vernon, Washington, for $16,991,453 or $133 per square foot. Comparable 3 is a December 2019 sale of a McClendon Hardware in Renton, Washington, for $15,049,407 or $128 per square foot. Comparable 4 is a September 2018 sale of a McClendon Hardware in Puyallup, Washington, for $11,400,100 or $132 per square foot.

Farnstrom considered Comparable 1 as a good indicator of value, and since it was in Salem, he gave it more weight. He considered comparable 2 as a fair indictor of value and

comparables 3 and 4 to be superior to the subject property. Farnstrom concluded the estimated value of the subject property is $116 per square foot or a rounded overall value of $16,023,400.

4.     *Defendant's conclusion*

Farnstrom reviewed the three approaches to value and determined the income approach was the best indicator of value, although the sales comparison approach, with the sale of a very close match, supported his conclusion of value for the subject property at $16,091,200. He gave the cost approach little weight.

## II.  ANALYSIS

At issue is the real market value of the subject property for the 2020-21 tax year. As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence. ORS 305.427.[2] Valuation is guided by appraisal principles, but the determination of the appropriate methodology in any given case is a question of fact. *Powell Street I, LLC v. Multnomah County Assessor*, 365 Or 245, 260-61, 445 P3d 297 (2019).

Real market value "means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). The assessment date for the 2020-21 tax year is January 1, 2020. ORS 308.007; ORS 308.210. Real market value is determined in accordance with rules adopted by the Department of Revenue. ORS 308.205(2). The rules require three approaches to value be considered: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

The parties agree that the subject property is in good condition, that Plaintiff has no intention of vacating the site, and that the property is in a "stabilized" condition. The parties also agree that the highest and best use of the property is a continuation of its existing use, although they disagree on how narrowly that use should be defined. Plaintiff urges the court to consider the existing use as general retail without a lease in place, while Defendant asserts the highest and best use of the property is its existing use as a home improvement warehouse with a lease in place.

The parties' approaches contain significant differences. The court must consider those differences, along with the fact that the evidence presented in this case does not align with either party's analysis, before reaching a conclusion.

One of the more significant differences between the parties' approaches is Plaintiff's adjustments described as "lease-up costs," which Plaintiff based on a cost estimate to demise the property provided by two local brokers, totaling $6,780,000. Buono testified that these lease-up costs were an adjustment for the difference in size of the subject property and the smaller comparable properties.

Buono's adjustment appears to the court to operate similarly to a stabilization adjustment; however, stabilization adjustments are appropriate only when the facts of the case demonstrate that such an adjustment is warranted. *See Powell Street I*, 365 Or at 260 (stabilization adjustment was appropriate where the loss of an anchor tenant was expected to impact the property for a period of 18 to 24 months); *see also BDC/Bend SPE, LLC v. Deschutes County Assessor*, TC-MD 210180R, 2023 WL 155125 (Or Tax M Div, Jan 11, 2023) (finding a newly opened senior independent living facility needed months to reach stabilized income.)

/ / /

Another notable difference is the parties' selection of comparables with and without long-term leases. Plaintiff chose properties without long-term leases in place, whereas Defendant selected properties where long-term leases may impact value but did not examine that impact. In this court's view, multiple cases stand for the proposition that property is presumed to be occupied by a hypothetical entity while also considered to be immediately available for a new owner or tenant. *See Dept. of Rev. v. River's Edge Investments, LLC*, 359 Or 822, 377 P3d 540 (2016); *see also Ellison v Dept. of Rev.*, 362 Or 148 (2017); *see also Powell Street I*, 365 Or at 256. The challenge posed by that legal standard is that many, if not all, transactions related to the building and leasing of big box stores are done outside the open market, rendering it difficult to obtain evidence of such transactions.

As Plaintiff discussed, prospective tenants do not routinely scour the market looking for pre-built facilities nearing upwards of 100,000 square feet to lease. They either build them and sell them in a sale-leaseback, or have another entity build them with their specific design requirements. The leases of such buildings become a form of financing. Plaintiff's closing argument highlighted that these types of leases are in fact a marketable commodity in themselves. A potential buyer or investor of a large, big box building would likely accept a different rate of return in exchange for a long-term national credit tenant. Thus, it is often the lease that gives a major portion of the value to a prospective purchaser of a big box store and not the physical building itself.

Plaintiff's approach assumes the property is occupied without a lease, implying it is vacant and values the property as if it were to be demised. This does not align with legal standards, which presume the property is occupied. There was no evidence of declining or

/ / /

transitioning big box stores near the subject property. Plaintiff's perspective does not match the current owner-occupied economically stable condition of the property.

Defendant's appraisal contained the opposite problem: it valued the subject property as occupied and selected comparable properties including leases with high credit tenants. Plaintiff argues that this method values the wrong property interest, as the selected comparables included preexisting leases, thereby incorporating income streams into their value. *The Appraisal of Real Estate* recognizes that contract rent versus market rent significantly affects leasehold value if there is a mismatch. Appraisal Institute, *The Appraisal of Real Estate* 62 (15th ed 2020). Defendant failed to provide evidence addressing this issue. Oregon law requires market value, not "value in use." *Ellison v. Dept. of Rev.*, 362 Or 148, 169, 404 P3d 933 (2017), *modified on recons,* 362 Or 527, 412 P3d 201 (2018). Defendant's method reflects value-in-use, but not necessarily the market's valuation for a hypothetical purchaser, rendering its comparables analysis unreliable.

Additionally, the cost approach is unhelpful here. Plaintiff rejected it due to the property's age, depreciation, and lack of marketplace data. Defendant presented, but ultimately gave little weight to, the cost approach analysis. Market participants would likely disregard this method of evaluating a building with significant depreciation.

Ultimately, the court is not persuaded by either party's evidence of the subject property's value because the comparable sale selections and, at times, lack of adjustments do not reflect the market evidence.

/ / /

/ / /

/ / /

### III.  CONCLUSION

Plaintiff failed to meet its burden of proof that the subject property's 2020-21 tax year real market value is lower than the value as was determined by BOPTA.  ORS 305.427. Additionally, Defendant failed to demonstrate that the subject property's 2020-21 tax year real market value was greater than the value as was determined by BOPTA.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of June 2024.

 

 

RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on June 21, 2024.*