IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

ALBERTSONS COMPANIES,       )
      )
      Plaintiff,       )    TC-MD 210135G
      )
      v.       )
      )
CLACKAMAS COUNTY ASSESSOR,       )
      )
      Defendant.       )    **DECISION**

This case concerns the 2020–21 real market value of a grocery store and underlying land in Milwaukie, identified in Defendant's records as Account 05005715. At trial, Plaintiff was represented by Alex Robinson, attorney-at-law, and Defendant was represented by Kathleen Rastetter, Senior Counsel in the Office of Clackamas County Counsel. Testifying for Plaintiff were David Demers, commercial broker for HSM Pacific Commercial Real Estate, and T. Chad Plaster, JD, MAI, of Moscato, Okoneski & Associates, Inc. Testifying for Defendant was David Sohm, Registered Appraiser for Clackamas County. Plaintiff's Exhibit 1 and Defendant's Exhibits A to G were admitted.

## I. STATEMENT OF FACTS

A.    *Overview*

The subject is a separately owned lot within a neighborhood shopping center, improved by a 47,512-square-foot (net rentable area) building operated as a Safeway grocery store.[1] (Exs 1 at 5–6; A at 7–8.) The subject's improvements were completed in 2004, when Safeway Inc. acquired the subject, demolished the previous improvements, and built its store. (Ex A at 26.) The store's features include a brick veneer over its concrete tilt-up construction, a loading dock

_____

[1] Defendant's appraiser has the net rentable area as 47,525 square feet; the difference is immaterial.

with a shed roof, heavy electrical service, cashier stations, "vinyl tile and wood-look LVT" flooring in the sales area, "a receiving/storage area, office area, bakery, butcher block, pharmacy, deli/food service, and utility rooms." (Exs 1 at 36–37; A at 44–45.)

As part of a portfolio sale involving multiple properties, Safeway Inc. sold the subject to a third party in January 2018 for $8,931,554 and leased it back to Plaintiff.[2] (Exs A at 26; 1 at 75.) That third party in turn sold the subject to investors in May 2018 for $10,973,000. (Exs 1 at 14; A at 26.) Both the portfolio sale and the subsequent resale to investors were arm's-length transactions. (*Id*.)

The board of property tax appeals upheld the $11,545,317 real market value placed on the 2020–21 assessment and tax roll by Defendant, and this appeal followed. Each party now requests that the court reduce the subject's real market value to the amount found by its appraiser: $7,750,000 for Plaintiff and $11,250,000 for Defendant.

B.      *The Appraisals*

Plaintiff submitted an appraisal prepared by Mr. Plaster, and Defendant submitted an appraisal prepared by Mr. Sohm. (Exs 1; A.) Both appraisers agree the subject's current use (as of the assessment date) was its highest and best use, but they characterize that use at different levels of generalization. Mr. Plaster describes the use as "big box retail"; Mr. Sohm describes it as "occupied supermarket." (Exs 1 at 44; A at 48.)

1.      *Plaintiff's appraisal*

Mr. Plaster developed the cost approach, the sales comparison approach, and a direct capitalization income approach in his appraisal.

///

_____

[2] Safeway Inc. and Plaintiff are related entities.

a.    Plaintiff's cost approach

In his cost approach, Mr. Plaster accepted the tax roll's land value of $2,030,000, calculated the replacement cost of the improvements using Marshall and Swift to be $9,710,127 when new, and deducted estimated depreciation of $3,373,182 to conclude to a rounded value of $8,365,000. (Ex 1 at 58.)

Although he developed the cost approach, Mr. Plaster wrote that "buyers of single-tenant retail properties like the subject place little, if any, weight on the Cost Approach[.]" (Ex 1 at 80.) On cross-examination, he admitted that he did not put any weight on it.

b.    Plaintiff's sales comparison approach

In Mr. Plaster's selection of comparable sales, "[e]mphasis was placed on locating sales of larger retail box stores that were not leased at the time of sale." (Ex 1 at 59.) Mr. Plaster considered vacant properties more similar to the subject than leased ones because the former reflected "the fee simple interest" that he was trying to determine for the subject. (*Id*.)

Of Mr. Plaster's six sales comparables, three sold vacant and three sold while leased. (Ex 1 at 62.) His only quantitative adjustments were time trending and a flat upward adjustment of $18 per square foot to each of the vacant sales to reflect the buyer's cost to prepare those buildings for occupancy. (*Id*. at 60.)

Mr. Plaster evaluated the similarity of his comparables to the subject qualitatively because he lacked data for paired sales analyses. (Ex 1 at 61.) He compared each sale to the subject based on its size (two of the vacant buildings were significantly larger than the subject), age, location, quality, condition, parking ratio, and site coverage. (*Id*. at 61–62.) For one sale, he made a qualitative upward adjustment for "sale conditions" because the buyer agreed to close "in two weeks all cash." (*Id*. at 62, 65.) His focus on the subject's fee simple interest impacted

his qualitative evaluation of the leased sales, which he judged to be qualitatively superior in that respect "based on the additional value created by the long-term leases in place and credit tenancy." (*Id*. at 59, 62.)

Mr. Plaster concluded that two of his leased sales were most similar to the subject: a store leased by discount retailer Kohl's that sold for an adjusted price of $143 per square foot, and a Safeway store that sold for an adjusted price of $251 per square foot. (Ex 1 at 66–67.) Of those two, Mr. Plaster considered the Kohl's store the better comparable. (*Id*.) Mr. Plaster reasoned that the Safeway store was "a spin-off from a previous portfolio purchase of properties leased back [to] Safeway at favorable lease terms[.]" (*Id*. at 66.) He argued that such a sale does not reflect market value because it includes "long term leases at above-market rents * * * generat[ing] investment value that exceeds the value of the real estate." (*Id*.) For the same reason, Mr. Plaster did not consider the subject's prior sale to be comparable and did not include it among his selected sales.

Mr. Plaster concluded to an indicated value of $165 per square foot under the sales comparison approach.

### c. Plaintiff's income approach

#### (1) Net operating income

Mr. Plaster selected six lease comparables, to which he applied a time trend and made qualitative adjustments similar to those made for his sales comparables. (Ex 1 at 70.) Two of the comparables were identified as former Albertson's grocery stores, now leased by a hobby store and a hardware store, which Mr. Plaster ranked as inferior to the subject. (*Id*.) Their (slightly adjusted) triple-net lease rates of $8.00 and $8.25 per square foot were therefore low indicators. (*Id*.) Two of the comparables had been discount general retailers; one was leased by

a farm supply store from Walmart, and the other was leased by Target. (*Id*. at 73–74.) Mr. Plaster ranked those two slightly inferior to the subject, with their adjusted lease rates of $9.82 and $9.88 per square foot as slightly low indicators. (*Id*.) The remaining two comparables were operating Safeway grocery stores—one of which he had also used in his sales comparison approach. (*Id*. at 74.)

Mr. Plaster ranked one of the Safeway stores as generally similar to the subject and one of them—the one used in his sales comparison approach—as superior. (Ex 1 at 74.) The "similar" Safeway store had an unadjusted rent of $10.20 and an adjusted rent of $10.35 per square foot, which Mr. Plaster determined was a "reasonable, if slightly low indicator." (*Id*.) Mr. Plaster disclosed that the "similar" store's rent was set through an arbitration process as follows:

> "In February 2018, Safeway renewed its lease for a five-year term, with the rent being set through an arbitration process involving three MAI-designated appraisers. The concluded market rent by this process was $12.00/SF on a triple-net expense basis, but the lease specified that rent be set at 85% of the market rent, or $10.20/SF."

(*Id*. at 74.) Thus, the rent for the "similar" Safeway store was ostensibly set at a below-market rate.

The remaining, "superior" Safeway store was so ranked on the basis of slight qualitative adjustments in four out of ten categories: a slightly inferior location, but slightly superior condition, "appeal," and site coverage. (Ex 1 at 70.) By comparison, Mr. Plaster ranked the "slightly inferior" farm store and Target as "inferior" or "slightly inferior" to the subject in six out of ten categories, and "slightly superior" in one category. (*Id*.) The "superior" Safeway's adjusted rent was $13.75 per square foot, which Mr. Plaster determined was a high indicator. (*Id*. at 74.)

On the basis of those comparables, Mr. Plaster determined a market rent for the subject of $10.50 per square foot and a potential gross income of $498,876. (Ex 1 at 75–76.) After deducting 2.5 percent in vacancy and credit losses and 5 percent in operating expenses, Mr. Plaster determined a net operating income of $462,310. (*Id*. at 76–77.)

(2)     Capitalization rate

Mr. Plaster chose a capitalization rate of 6.0 percent, based primarily on his analysis of five sales and supported by a PricewaterhouseCoopers national investor survey. (Ex 1 at 77–79.) The survey showed a range of capitalization rates from 4 to 8 percent for net leased properties nationally, with an average of 6.16 percent. (*Id*. at 78.) The five sales included two used in the sales comparison approach—the "superior" Safeway (5.45 percent) and the hardware store (6.50%)—and three others located in Washington and southern Oregon—a home improvement store (5.85%), another hardware store (6.26%), and a farm supply store (7.16%). (*Id*. at 77–78.)

Mr. Plaster narrowed the range indicated by the five sales by discarding the sale of the Safeway store and the farm supply store as high and low indicators. (Ex 1 at 78.) He concluded that the Safeway sale was a low indicator even though he thought its rent was above market because it was "for a long term with a credit tenant." (*Id*.) He reasoned that the farm supply store was a high indicator because it was "an older facility with a renovation prior to the tenant taking occupancy, with an inferior location, and an older date of sale[,]" with a rental rate reflecting "the risk characteristics of the tenant and the more questionable long-tern durability of the lease[.]" (*Id*.) Because of unspecified differences in the remaining sales' "market location, tenancy, remaining lease term and physical characteristics[,]" Mr. Plaster determined that a capitalization rate "closer to the lower end of this range, or 6.00%[,] is supported for the subject on a fee simple stabilized basis." (*Id*.)

Given a net operating income of $462,310 and a capitalization rate of 6.00 percent, Mr. Plaster concluded to an indicated value of $7,705,160 under the income approach. (Ex 1 at 79.)

d.        Plaintiff's final reconciliation

Mr. Plaster placed primary weight on the income approach and supporting weight on the sales comparison approach, noting that "few recent fee simple sales were found of similar big box retail stores in the subject's immediate market area." (Ex 1 at 80.) He placed "little, if any, weight on the Cost Approach[.]" (*Id*.) His final indicated value was $7,750,000. (*Id*.)

2.        *Defendant's appraisal*

Defendant's appraiser, Mr. Sohm, developed the sales comparison approach and the income approach.

a.        Defendant's sales comparison approach

Mr. Sohm relied for comparables on seven sales of stores leased by Safeway, including the sale of the subject 19 months before the assessment date. (Ex A at 52–55.) All seven sales had the same seller, who had purchased 50 stores from Plaintiff in 2016 in a sale-leaseback transaction. (*Id*. at 53.)

Mr. Sohm made qualitative adjustments to the portfolio spinoff sales for time, location, and exposure, determining a range of indicated values between $226 and $254 per square foot. (Ex A at 53–55.) Giving most weight to the subject's own sale, which he found had an adjusted sale price between $239 and $246 per square foot, as well as the three most similar properties' sales, Mr. Sohm concluded to a per-square-foot value of $242 for the subject, or $11,500,000. (*Id*.)

/ / /

/ / /

b.     Defendant's income approach

Mr. Sohm's income approach relies on lease data contained in a confidential addendum to his appraisal report. He describes the market segment of his lease comparables as "involving occupied supermarkets similar to the subject." (Ex A at 56.) According to Mr. Sohm, such properties "typically have long term tenants in place that provide the purchaser a low level of risk that the future income will not be realized." (*Id*.) "The leases reported in the confidential addenda to this report were the most comparable leases that the appraiser was able to identify and verify in terms of time, location, physical features and lease characteristics." (*Id*.)

Based on that confidential data, Mr. Sohm concluded to an annual market rent of $12.40 per square foot for the subject. (Ex A at 56, 59.) That market rent was "slightly lower than the contract rent for 2020." (*Id*. at 59.) He therefore determined a potential gross income and net operating income of $589,310. (*Id*. at 56.) Mr. Sohm's concluded net operating income was the same as potential gross income because, according to "brokers in the subject net lease market segment," deductions for vacancy, expenses, and reserves are not typical for this kind of property. (*Id*. at 59.)

Mr. Sohm selected a capitalization rate based on data published by CoStar, as well as confidential data. (Ex A at 56.) He presented the CoStar data in a table of 14 sales of "Investment Class Supermarket Properties"—including the subject—with overall capitalization rates ranging from 4.50 to 5.87 percent. (*Id*. at 57.) The subject's capitalization rate at the time of its May 2018 sale was 5.25 percent. (*Id*.) Mr. Sohm determined that 5.25 percent was still applicable to the subject as of the assessment date because the data did not show any "significant change in overall capitalization rates between mid-2018 and early 2020." (*Id*. at 58.)

/ / /

Dividing a net operating income of $589,310 by a capitalization rate of 5.25 percent, Mr. Sohm's income approach reached an indicated value of $11,225,000.

c.      Defendant's final reconciliation

Mr. Sohm gave secondary weight to his sales comparison approach in his final reconciliation because of "a degree of subjectivity" in the adjustments for location, age, and size. (Ex A at 59.)  Giving primary weight to his income approach, he concluded to a final estimated real market value of $11,250,000.  (*Id.*)

## II.  ANALYSIS

The subject's 2020–21 real market value is at issue, and Plaintiff must bear the burden of proving a value lower than conceded by Defendant.  *See* ORS 305.427.[3]

The parties' appraisals reflect striking differences in choices of comparable sales and leases.  For Plaintiff, Mr. Plaster disfavored sales of leased properties as failing to show the "fee simple" interest.  For Defendant, Mr. Sohm relied entirely on sales and leases of properties spun off from a portfolio sale-leaseback of grocery stores, which Mr. Plaster largely rejected in favor of vacant properties and former supermarket buildings repurposed for new uses.  The parties' differences in choice of comparables reflect different views of the property interest being valued.

A.      *The Interest Valued and the "Fee Simple" Interest*

The property interest valued in a tax assessment is described by our Supreme Court in *Swan Lake Moulding Company v. Department of Revenue*, 257 Or 622, 478 P2d 393 (1970) (*Swan Lake I*), *reh'g den*, 257 Or 622, 480 P2d 713 (1971) (*Swan Lake II*).  In *Swan Lake I*, the taxpayer argued that certain long-term commercial leases reduced its property's income potential and thus its value, while the county argued the leases had no effect on value.  *Swan Lake I*, 257

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

Or at 624–25. The court held for the county: "In fixing the true cash value of land for property tax purposes the effect of existing leases on the value to the owner is disregarded." *Id*. at 625. The court reasoned:

> "The basis for such a principle is that the tax is levied upon the land and is a tax upon all the interests into which the land might be divided. Admittedly, a lease might decrease the price which the owner might receive; however, the tax is not merely upon the owner's interest; the tax is upon all the interests in the land, including the leasehold interest. This is so because of the corollary principle that taxes are assessed only against the one having title[.] * * *."

*Id*. (citing *First National Bank of Portland v. Marion County*, 169 Or 595, 612–13, 130 P2d 9 (1942) (leaseholds and other interests in real property generally "are not, for the purpose of taxation, made severable and assessable in the names of the owners of the respective interests"). Although a property's owner is responsible for the taxes, it is not only the owner's interest that is appraised, but "[t]he entire beneficial interest in the property." *Commonwealth, Inc. v. Dept. of Rev.*, 259 Or 140, 145, 484 P2d 1103 (1971).

The holding of *Swan Lake I* shows how the market-value standard for tax assessment (called "true cash value" when *Swan Lake I* was decided and "real market value" today)[4] applies where the price for which an owner could sell the property is affected by a below- or above-market lease. *Swan Lake I*, 257 Or at 625. "If the rent reserved in the lease is less than the property is capable of producing, the lessee's interest is more valuable and it is the entire group of interests in the property, lessor's and lessee's, that is valued." *Swan Lake II*, 257 Or at 629. Thus, even a commercial property with a long-term, below-market lease should be valued for

/ / /

---

[4] *Compare* 1955 Or Laws, ch 691, § 1 ("[t]rue cash value of all property, real and personal, means market value as of the assessment date") *with* ORS 308.205(1) ("[r]eal market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year").

assessment purposes as if its rent were at market rate, and a property with an existing above-market lease should be treated similarly.

In *Powell Street I, LLC v. Multnomah County Assessor*, 365 Or 245, 445 P3d 297 (2019), our Supreme Court restated the rule of *Swan Lake* using the term "fee simple" to describe the interest being valued in property assessment, while making clear that it was not thereby excluding leaseholds from the assessment:

> "When the property is subject to leases (as is the case for the shopping center here), the value for property tax purposes may differ from the price that the owner actually might receive for the property. That is because the property tax is assessed on the fee simple interest in the property, which is the value of all interests in the property, including those of the owner (ordinarily the lessor) and any lessees. That rule was relied upon and explained in *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or. 622, 478 P.2d 393 (1970), *reh'g den*, 257 Or. 622, 480 P.2d 713 (1971)."

*Powell Street*, 365 Or at 248 (footnote omitted) (noting easements appurtenant are exception to general rule).

Although the *Powell Street* court explicitly adopted the holding of *Swan Lake* that a property's value for tax purposes includes the value of both owners' and lessees' interests, its use of the term *fee simple* is potentially ambiguous because lawyers and appraisers use that term differently. *See* Appraisal Institute, *The Appraisal of Real Estate* at 60–61 (15th ed 2020).

According to *Black's Law Dictionary*, the term *fee simple* is short for "fee simple absolute"; it is "the broadest property interest allowed by law, endur[ing] until the current holder dies without heirs[.]" *Black's Law Dictionary* (11th ed 2019), *s.v.* "fee simple." Nothing in that definition implies that a fee simple interest is composed of lesser interests, such as leaseholds. To the contrary, an owner's fee simple interest endures even when that owner becomes a lessor and grants the leasehold estate to a lessee. If the lease is unfavorable to the owner, the market

/ / /

value of the owner's interest may be diminished, as allegedly occurred in *Swan Lake I*. That owner's interest is the fee simple interest, as the term *fee simple* is used by lawyers.

In contrast, appraisers use the term *fee simple* to distinguish unencumbered property from what they term "leased fee" property. The latter term, which is not used in law, refers among appraisers to the property interest retained by a lessor or landlord. *The Appraisal of Real Estate* at 62. The appraiser's "leased fee," in legal terms, is equivalent to "fee simple subject to lease." The appraiser's definition of *fee simple* differs from the lawyer's in that it concerns encumbrances rather than durability: "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." *Id*. at 60, quoting Appraisal Institute, *The Dictionary of Real Estate Appraisal* (6th ed 2015). It is well contrasted with the legal definition by the following example: "A lender requesting a valuation of the fee simple estate likely intends to refer to an unencumbered interest, whereas a deed that conveys fee simple title would generally be understood to mean an interest that will endure indefinitely, including all encumbrances." *Id*. at 61.

In using the term *fee simple*, the *Powell Street* court relied on the testimony of the appraisers and on the 14th edition of *The Appraisal of Real Estate*.[5] *Powell Street*, 365 Or at 251. Unlike the 15th edition, the 14th edition does not distinguish the legal and appraisal senses of *fee simple*. *Cf*. Appraisal Institute, *The Appraisal of Real Estate* at 441 (14th ed 2013). While the court accurately identified the subject of valuation as including both lessors' and lessees' interests, the term *fee simple* creates an ambiguity for appraisers, who are accustomed to

---

[5] While the court characterized *Swan Lake* as stating a holding regarding fee simple valuation, the term *fee simple* is not used in that case. Likewise, the term is not found in a law review article relied on by the court. *Cf*. Joan M. Youngman, *Defining and Valuing the Base of the Property Tax*, 58 Wash L Rev 713 (1983).

choosing unleased comparables when they perform "fee simple" valuations: "When the fee simple interest is valued, the presumption is that *the property is available to be leased* at market rates." *Id*. (Emphasis added.)

For tax purposes a property must be valued as if it were being put to its highest and best use—and the highest and best use of a rental property surely includes generating market rent from a lessee. *See Powell Street*, 365 Or at 247–48 ("real market value is derived from the 'highest and best use' of the property—the most profitable use, for which a buyer would be expected to pay the highest price"). Thus, a vacant commercial property may require a "stabilization" adjustment to account for its lacking the immediate capacity to generate its potential gross income. *See id*., 365 Or at 260–62 (upholding lower court's finding that such an adjustment was appropriate). A stabilization adjustment implies that a commercial property without a rent-paying tenant for an extended period is not exhibiting typical market behavior.

Thus, applying the sales comparison approach for tax assessment purposes does not require appraisers to avoid "leased fee" comparables for commercial buildings. To the contrary, all else being equal, sales of commercial properties leased at market rents are better indicators of market value than are vacant buildings that meet the appraiser's definition of "fee simple."

B.    *The Appraisals*

1.    *Plaintiff's appraisal*

The above considerations guide the court's evaluation of Mr. Plaster's appraisal. There is no dispute that continued operation of the subject in its current use was viable under the market conditions of the assessment date. Thus, all else being equal, stabilized commercial properties would be more comparable to the subject than vacant ones.

/ / /

Mr. Plaster's sales comparison approach relies heavily on vacant properties, which comprise half his comparable sales. To his credit, neither of the two sales he identified as "most comparable" were of vacant properties. Yet those two sales yielded a wide range—$143 per square foot for a Kohl's store versus $251 per square foot for a Safeway—and the vacant sales evidently influenced Mr. Plaster in his choice of a value of $165 per square foot, near the low end of that range.

Although Mr. Plaster gives limited weight to the $251-per-square-foot Safeway sale, he completely discounts the sale of the subject itself at $231 per square foot, giving it "no weight." He disfavors both sales for the same reason; namely, that they are spinoffs from the portfolio sale-leaseback. It is not clear why one Safeway spinoff sale is among the two most comparable, while the sale of the subject is given no weight at all.

In applying the income approach, Mr. Plaster relies heavily on properties in second-generation use, with at least half of his lease comparables involving tenants who were not the original occupants.[6] Built-to-suit properties that have shifted from first- to second-generation use may have undergone a shift in highest and best use, such that they participate in a different market. *See Helms Deep LLC v. Multnomah County Assessor*, TC–MD 190153N, 2021 WL 3137981 at *3, *7 (July 23, 2021) (accepting testimony to that effect). Here, the rents required by the second-generation leases are notably less than the rent required by the one first-generation lease set at market rent, leaving open the question of whether the properties participate in different markets.

The lease on which Mr. Plaster places primary weight is a first-generation Safeway store rented at $10.35 per square foot. In concluding to a market rent of $10.50 per square foot,

---

[6] It is unclear whether the Target lease is original occupancy.

however, Mr. Plaster does not address the fact that that Safeway's rent was set by arbitration at 85 percent of what "three MAI-designated appraisers" concluded was its market rent of $12.00 per square foot. While those appraisers were not present at trial to testify, the evidence suffices to show that that property's lease rent is suspect as an indicator of market rent.

As occurred among his sales comparables, Mr. Plaster was inconsistent in assigning weight to Safeway leases. He identified one other Safeway lease as comparable—the lease for the same store he identified as a sales comparable—but gave the subject's own lease "no weight," although both stores were spinoffs from the portfolio sale.

Given its primary reliance on the Safeway lease that was set in a mediation process designed to reach a nonmarket rent, its rejection of the subject's own lease and sale while accepting a similarly situated Safeway's lease and sale, and its extensive reliance on vacant sales and second-generation leases even though the subject remains viable as a first-generation supermarket, Mr. Plaster's appraisal is not a sufficiently reliable indicator of the subject's real market value.

2.      *Defendant's appraisal*

The physical characteristics of the properties identified by Mr. Sohm are exceptionally similar to the subject. The properties from which he draws his sales and lease comparables are predominantly operating supermarkets. The seven sales on which he relies for his sales comparison approach are all Safeway stores. The lease comparables supporting his income approach are confidential. Were it not for the fact that Mr. Sohm's appraisal relies on spinoff sales from the January 2018 portfolio sale-leaseback, there would likely not be a dispute as to its accuracy.

/ / /

Plaintiff argues that relying on those spinoff sales is wrong. The leases of the sold properties were all negotiated between Safeway and the buyer, who received a price for the subject ($8,931,554) about $2 million lower than the price for which the subject was sold to individual investors just four months later ($10,973,000). According to Mr. Plaster, the leases negotiated at that time were above-market and the spinoff sales then included a premium over the market price because of favorable rents.

The circumstances of the portfolio sale certainly obscure the motives of the parties to the transaction. One possibility is that Safeway agreed to below-market sale prices, offering its buyer a "bulk discount" in order to sell as many stores as it needed to raise sufficient capital. Whether Safeway accepted higher-than-market leases during the sale-leaseback is difficult to discern.

Although there is limited evidence to test Mr. Plaster's assertion that the portfolio leases were above-market, evidence of the subject's capitalization rate is suggestive. According to a PricewaterhouseCoopers survey cited by Mr. Plaster, the range of expected capitalization rates for this type of property was 4 to 8 percent. Mr. Plaster relied in part on one of his second-generation sales comparables in concluding to a capitalization rate of 6 percent. Considering the likelihood that such a property would participate in a different market than the subject, it is to be expected that the subject's capitalization rate would be somewhat lower. According to data from CoStar included in Mr. Sohm's appraisal, the subject's capitalization rate for its May 2018 sale was 5.25 percent—a "somewhat lower" amount.

Supposing a 5.25-percent capitalization rate were accepted, the subject's rent and its spinoff sale price could not both be above market. Because the capitalization rate is the ratio of net operating income (NOI) over market value, above-market rents would tend to increase the

NOI and thereby reduce the sale price; conversely, an above-market sale price would require a decreased NOI, implying below-market rents.

Capitalization rates are always uncertain, and there is not a true cross-check here—only a theoretical expectation that the rate should be "somewhat lower" than a rate derived using a second-generation sale. It remains possible that the subject's actual capitalization rate is half a point higher, for instance, and that its rent and spinoff sale price are somewhat high. Nevertheless, the 5.25-percent capitalization rate is plausible. For all the uncertainties attending the portfolio sale and the leaseback, they involve similar properties and market participants operating at arm's length. Whether Mr. Sohm's appraisal could bear the burden of proof is unclear, but it remains more plausible than Mr. Plaster's.

### III.  CONCLUSION

On the evidence before the court, Plaintiff has not borne its burden of proof. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2020–21 real market value of the property identified in Defendant's records as Account 05005715 is, as conceded by Defendant, $11,250,000.

Dated this ____ day of December 2023.

_____
POUL F. LUNDGREN,
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on December 22, 2023*